**G'S BOTTOMS UP SOCIAL CLUB, Plaintiff,**

v.

**F.P.M. INDUSTRIES, INC., Frank McDermott, and Robert Ader, Defendants.**

**F.P.M. INDUSTRIES, INC., Counterclaimant,**

v.

**G's BOTTOMS UP SOCIAL CLUB and Maureen MacDonnell, Counterclaim-Defendants.**

**No. 82 Civ. 5448 (WCC).**

United States District Court, S.D. New York.

Nov. 14, 1983.

Maureen MacDonnell and Georgia Fleenor, representatives of plaintiff and counterclaim-defendants, pro se.

Gottlieb, Rackman & Reisman, P.C., New York City, for defendants and counterclaimant; Jane Shay Wald, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This action involves a dispute over the right to use the name "Candle" and an accompanying logo showing a candle extending diagonally across a circle in connection with the operation of a bar. On June 27, 1983, this matter was heard by the Court, sitting without a jury. This Opinion and Order incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

Plaintiff G's Bottoms Up Social Club ("G's Bottoms Up") operates a "club" or bar at 168 Amsterdam Avenue in Manhattan under the name "Candle Club." Defendant F.P.M. Industries, Inc. ("FPM") owns and operates a bar at 309 Amsterdam Avenue, approximately seven blocks north of plaintiff's location, under the name "Candle Bar." Both establishments cater primarily to the male homosexual community.

In July 1982, G's Bottoms Up commenced an action in Supreme Court, New York County, claiming ownership of the "Candle" service mark, and seeking damages for and an injunction from defend-

ants' alleged infringement of the mark. On August 17, 1982, defendants removed that action to this Court pursuant to 28 U.S.C. §§ 1441(b) and 1446. Thereafter, on August 25, 1982, defendant FPM filed a counterclaim against plaintiff also claiming ownership of the "Candle" mark and seeking damages for and an injunction restraining plaintiff's allegedly infringing use.

### I. *Pretrial Events*

This case was originally scheduled to go to trial on March 14, 1983. On February 10, 1983, the parties appeared before the Court and requested an adjournment of the scheduled date because they had not completed their discovery. At this stage of the proceedings, plaintiff was represented by retained counsel, Hart Baxley, Daniels & Holton, Esqs. The Court granted the parties' application and adjourned the trial until April 11, 1983.

On March 31, eleven days before the rescheduled trial date, plaintiff's attorney, Thomas Farley, Esq. ("Farley"), contacted the Court and indicated that he had been discharged by his client. At a conference on April 1, the Court denied Farley's application to withdraw from this action with leave to renew the application if plaintiff could find substitute counsel and be ready for trial on April 11.

On April 6, the parties again appeared for a conference before the Court at which time plaintiff's attorney reiterated his request to be relieved. He indicated that his clients refused to cooperate with his efforts to prepare for trial, and thus he was unable effectively to represent plaintiff's interests. The Court granted this renewed application, but ordered Farley to inform his former clients that they should appear personally before the Court on April 8.

On April 8, 1983, Maureen MacDonnell ("MacDonnell"), Secretary of G's Bottoms Up, and Georgia Fleenor ("Fleenor"), President of that club, appeared before the Court. At that time, Fleenor explained to the Court that she had discharged plaintiff's attorney because he was not a homosexual, and she felt that for that reason he could not fully understand and adequately represent plaintiff's position in this dispute.

Though unpersuaded by the assumption underlying Fleenor's desire for a gay attorney, the Court nevertheless adjourned the scheduled trial to April 25 to allow plaintiff to retain new counsel. At the same time, the Court emphatically informed Fleenor and MacDonnell that it would allow no further extensions of time.

Instead of appearing for trial on April 25 as directed, the parties appeared before the Court on the following day, April 26. In a somewhat hysterical and irrational manner, Fleenor and MacDonnell asked the Court for a further postponement to allow them additional time to find a homosexual attorney. Over defendants' objection, and perhaps against its own better judgment, the Court yielded to Fleenor's impassioned plea and adjourned the trial yet again until June 27.

On June 10, 1983, with the new trial date quickly approaching and not having heard a word from Fleenor or MacDonnell, the Court sent letters to plaintiff, Fleenor and MacDonnell reminding them of the June 27 trial date and directing them to contact the Court. The Court received no response to this letter which was, according to a certified mail receipt, delivered to MacDonnell on June 11.

On June 27, MacDonnell appeared before the Court without an attorney and stated that Fleenor could not be present because she was recovering from an attempt to commit suicide. *See* Tr. at 4.[1] Although the Court did not grant still another postponement of the trial, it denied defendants' motion to dismiss plaintiff's claims on procedural grounds. *See* Tr. at 7. In addition, the Court informed MacDonnell that it would consider an application from her for leave to call witnesses at a reasonable future date. *See* Tr. at 5, 7. FPM then proceeded with its counterclaim. MacDonnell was present throughout the short proceeding and cross-examined FPM's only witness.

At the end of trial, the Court granted FPM leave to file a post-trial brief; MacDonnell was given an additional week to reply to FPM's submission. On July 18, 1983, FPM filed its post-trial memorandum. On July 26, the Court, over FPM's objec-

---

**1.** All references to Tr. are to the transcript of the trial in this matter dated June 27, 1983.

tion, granted MacDonnell's request for an extension of her time to respond until August 26. Thereafter, MacDonnell requested a further postponement, which was granted until September 6, 1983. The Court has to date not received any post-trial memorandum from MacDonnell or G's Bottoms Up.

II. *Facts*

Almost continuously for approximately the past 20 years, the storefront located at 309 Amsterdam Avenue has housed a male gay bar operating under a name comprising some combination including the word "Candle." *See* Tr. at 26; *see also* Sabathe Dep. at 6. In March 1972, the Candle Light Tavern, Inc. (the "Old Candle") operated at 309 Amsterdam Avenue under the ownership of a corporation bearing the same name. *See* Sabathe Dep. at 5, 11. The New York State Liquor Authority issued a liquor license for the bar, which license listed Jean Sabathe ("Sabathe") and Helen Linsalto ("Linsalto") as the two principals of the corporation. *See* Def. Ex. T at 7; Tr. at 30–31; Sabathe Dep. at 4.

Beginning sometime in 1973, MacDonnell began to work as a barmaid at the Old Candle. *See* Sabathe Dep. at 24; MacDonnell Dep. at 30–31. She subsequently became manager of the bar, *see* Sabathe Dep. at 24; MacDonnell Dep. at 31, for which she was paid a salary, in cash, of approximately $150 per week. *See* MacDonnell Dep. at 42. At no time, however, did MacDonnell have an ownership interest in either the Old Candle or the underlying corporation. *See id.* at 32; Sabathe Dep. at 6.

During her tenure as manager, MacDonnell attempted to alter the image of the Old Candle. First, she shortened the name of the bar from the "Candle Light" to "Candle" by removing the word "Light" from the sign outside the front of the bar. *See* MacDonnell Dep. at 47; Sabathe Dep. at 25. Moreover, MacDonnell designed the disputed logo, portraying a candle within a circle, which was used in advertisements for the bar, *see, e.g.,* Def. Ex. D at 19, and on promotional T-shirts, buttons, and flyers. *See* MacDonnell Dep. at 55, 65–66. In addition, MacDonnell totally redecorated the interior of the 309 Amsterdam location to give it a more masculine image. *See* Sabathe Dep. at 25.

MacDonnell worked as manager of the Old Candle until sometime in 1977, when she left to become manager of the Half Breed, a bar located at 168 Amsterdam Avenue. She worked as a salaried employee at the Half Breed until it closed in the late summer of 1980 when, at the suggestion and with the assistance of the accountant for the Half Breed, she became involved in organizing a private club at the 168 Amsterdam location. *See* MacDonnell Dep. at 10–12. In September 1980, G's Bottoms Up opened as a not-for-profit club. *See* MacDonnell Dep. at 11, 17–18. After approximately four months of operation, the club changed its name from G's Bottoms Up to "Candle" and began using the candle-in-a-circle logo. See MacDonnell Dep. at 91.

Following MacDonnell's departure from the Old Candle in 1977, the bar continued to operate until sometime until early 1978, when its liquor license was revoked by the State Liquor Authority. *See* Sabathe Dep. at 15–16, 28.[2] At approximately the same

2. In a March 19, 1979 decision denying the application of 309 Rest., Inc. for a liquor license at the same location, the Liquor Authority explained the circumstances surrounding its revocation of the Sabathe/Linsalto license.

The principals of the last licensee in the applied for premises, Candle Light Tavern, Inc., namely Jean A. Sabathe and Helen Linsalto, were charged with not being the true and/or sole parties in interest in said premises, but that William Elmer "Sonny" Tobin, Jennie Endicott, his wife, and/or Joan Mendez, their daughter, a principal in landlord corporation, also have an interest therein.

Tobin was the principal (he has since been shot and killed) of Yorkville Vending Corp. and Revere Vending Corp. which supplies amusement and vending machines to various licensed premises, including the last licensee. Joan Mendez's husband, Thomas Mendez, is employed by both Yorkville Vending Corp. and Revere Vending Corp. Joan Mendez also operates an antique store next door to the premises.

The license issued to Candle Light Tavern, Inc. was cancelled and recalled effective November 28, 1977, because of the false testimony of Jean A. Sabathe. On appeal, the Appellate Division First Department unanimously

time MacDonnell left the Old Candle to go to the Half Breed, defendant Robert Ader ("Ader"), the sole shareholder of FPM,[3] attempted to determine whether the Old Candle was for sale. Upon inquiring, Ader was told by the Liquor Authority that Helen Linsalto ("Linsalto") was listed as President of the corporation operating the Old Candle. *See* Tr. at 30. Accordingly, on June 12, 1977, Ader wrote a letter to Linsalto at 309 Amsterdam Avenue asking whether the bar was for sale. *See* Def. Ex. G. Ader received a reply, dated June 20, 1977, in which Linsalto stated the bar was not currently for sale. *See* Def. Ex. H.

On June 25, 1977, Ader wrote a letter to Robin Endicott ("Endicott"), the landlord of 309 Amsterdam Avenue, seeking to negotiate a lease for the bar location if it became available. *See* Def. Ex. I. Endicott responded to Ader's offer on July 1, 1977, and indicated that although the bar location was presently under lease, she had already granted a nearby merchant the first option to obtain a liquor license for the location if it did become available. *See* Def. Ex. J.

On January 14, 1978, Ader renewed his inquiries to both Linsalto and Endicott by separate letters addressed to each woman at 309 Amsterdam Avenue. *See* Def. Exs. K and L. Endicott responded to Ader's renewed request by letter dated January 20, 1978, in which she indicated that because the Old Candle had given up its lease she would discuss a lease with Ader should the nearby merchant not be able to obtain a liquor license. *See* Def. Ex. M. On January 27, Linsalto telephoned Ader and discussed the sale of the Old Candle. *See* Tr. at 36–37; Def. Ex. N. Thereafter, on February 12, Linsalto met with Ader and signed a bill of sale transferring to Ader, for payment of $1500, certain rights and physical properties, including the rights to the "Candle" name and logo, which she warranted were owned by Candle Light

Tavern, Inc. *See* Def. Exs. R and N. On June 2, 1982, Ader transferred those rights to FPM. *See* Def. Ex. S; Tr. at 39–40.

In early February 1978, after Ader had reached an agreement in principle with Linsalto, he arranged with Endicott to store the physical properties he had purchased at 309 Amsterdam Avenue, pending Endicott's determination whether she would lease the location to Ader or to a third party. *See* Def. Exs. O, P, and Q. Sometime during the summer of 1978, Ader removed many of these items from 309 Amsterdam Avenue and placed them in the Cross Road, another gay bar he owns, which is located at 858 Ninth Avenue, several blocks west of the Amsterdam Avenue storefront. *See* Tr. at 50–51. At the Cross Road, Ader created a separate lounge on the balcony level of the bar and filled it with memorabilia from the Old Candle, including a large oil painting of a muscular man holding a candle, a posterboard portraying the candle-in-a-circle logo, and many amber hurricane lamps containing candles. *See* Tr. at 52–53. At the same time, Ader placed a large "closed for renovation" sign in the window at 309 Amsterdam, which sign directed patrons to enjoy the Candle Lounge at the Cross Road. *See* Tr. at 51.

Ader subsequently learned that the nearby merchant to whom Endicott had given the first option to obtain a liquor license at 309 Amsterdam was Francis J. McNulty ("McNulty"), proprietor of a clothing store located at 313 Amsterdam Avenue. On March 19, 1979, the State Liquor Authority denied McNulty's[4] application for a license. *See* Def. Ex. T. McNulty appealed that denial, but on November 26, 1979 the Supreme Court, New York County affirmed the Liquor Authority's decision. *See id.*

Approximately one year later, on December 19, 1980, FPM was incorporated. *See* Def. Ex. U. Ader thereafter applied for a

---

confirmed the Authority's determination and the cancellation became effective May 2, 1978. Def. Ex. T at 7.

**3.** *See* Tr. at 42. The parties stipulated well prior to trial, at a point when plaintiff was still represented by counsel, to drop defendant Lonnie Kennett from this action. It was also adduced at trial that neither Kennett nor defendant

Frank McDermott has any relationship with FPM. *See* Tr. at 42–43, 99. Accordingly, the complaint against McDermott is dismissed.

**4.** The application was in the name of 309 Avenue Restaurant, Inc., of which McNulty was President and a 70% shareholder. *See* Def. Ex. T.

liquor license, which was granted on February 17, 1982. On March 5, 1982, FPM filed with the New York State Records Division a certificate of assumed name for "The Candle," *see* Def. Ex. X, and in June 1982 Ader removed the candle-related objects from the Cross Road and reopened The Candle (the "New Candle") at 309 Amsterdam. *See* Tr. at 56.

III. *Discussion*

 Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in part:

Any person who shall ... use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

The crux of a claim under this section is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979), *quoting, Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *see Warner Bros., Inc. v. American Broadcasting Co., Inc.*, 523 F.Supp. 611, 618 (S.D.N.Y.), *aff'd*, 654 F.2d 204 (2d Cir. 1981). Under this standard a showing only of likelihood of confusion, and not of actual confusion, is necessary. *See W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 662 (2d Cir.1970). Moreover, no intent to deceive or pass off one's goods as another's need be demonstrated: It is sufficient that the public may be deceived by the use of the similar mark. *Apollo Dist. Co. v. Apollo Imp. Co.*, 341 F.Supp. 455, 458 (S.D.N.Y. 1972).

 In the instant case, FPM asserts its right, as against G's Bottoms Up and Mac-Donnell, to use the Candle name and logo in connection with the operation of a bar or tavern. Although FPM has not registered either the Candle name or logo, registration is not a prerequisite for protection under the Lanham Act: Section 43(a) affords protection against infringement not only of registered marks but also of common law trademark rights. *See, e.g., Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 78 (2d Cir.1981); *New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1198–99 (9th Cir.1979); *National Lampoon, Inc. v. American Broadcasting Co., Inc.*, 376 F.Supp. 733, 747 (S.D.N.Y.), *aff'd*, 497 F.2d 1343 (2d Cir.1974).

 At the present time, both FPM and G's Bottoms Up are using the Candle name and logo to promote drinking establishments located within seven blocks of one another. As between conflicting claimants to the right to use the same mark, the general rule is that "priority of appropriation determines the question." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 100, 39 S.Ct. 48, 51, 63 L.Ed. 141 (1918). MacDonnell and G's Bottoms Up began using the Candle name and logo at 168 Amsterdam Avenue no earlier than December 1980. There is no evidence in the record from which the Court could conclude that their rights in the Candle name and logo originated before that date. Although MacDonnell did indeed design the logo while she worked at the Old Candle, conception of a term or design, without actual use in connection with a particular business, is insufficient to establish trademark rights in the creation. *See Montgomery v. Kalak Water Co. of N.Y., Inc.*, 196 F.Supp. 173, 177 (S.D.N.Y.1961). One acquires rights in a particular mark not merely by adopting it, but by using it in connection with an ongoing business. *See United Drug, supra*, 248 U.S. at 97, 39 S.Ct. at 50; *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866, 874 (E.D.N.Y.1978). Thus, any trademark rights in the Candle name and logo which existed at the time the Old Candle was in operation were rights of Candle Light Tavern, Inc., as owner and operator of the bar, and not of MacDonnell.

■ The record further supports a finding that Ader acquired those rights from the Candle Light Tavern, Inc. in February 1978, after the corporation lost its liquor license in late 1977. It is well settled that one can purchase trademark rights from another: However, in order for the validity of the mark to survive the transfer, "the assets which are purchased with the name [must be] sufficient to enable the purchaser to 'go on in real continuity with its past.'" *Merry Hull & Co. v. Hi-Line Co., Inc.*, 243 F.Supp. 45, 51 (S.D. N.Y.1965) (citation omitted). Here, Ader purchased not only the Candle name and logo, but also all of the corporation's tangible assets, including bar fixtures, decorations and signs, which would serve to recreate the atmosphere of the Old Candle in a new establishment and thus to identify the new bar as the Candle. Consequently, the Candle mark survived the transfer to Ader.

■ Where there has been a valid sale of a mark, the purchaser steps into the shoes of his predecessor, "enjoying the latter's rights in the mark dating from its initial use and suffering the burdens on and limitations of its use that were incumbent upon his predecessor." *Johanna Farms, supra*, 468 F.Supp. at 874–75. Following his acquisition of the Candle mark in February 1978, Ader continued to use it at another bar until he was able to obtain a lease and liquor license for the 309 Amsterdam Avenue location that had been occupied by, and was identified with, the Old Candle. Because Ader subsequently transferred his interest in the mark to FPM, FPM's right to use the Candle name and logo derives ultimately from the use by Candle Light Tavern, Inc., which dates from the 1973–77 period, well prior to the 1980 use at 168 Amsterdam by MacDonnell and G's Bottoms Up. Accordingly, under the general rule of first in time, first in right, *see United Drugs, supra*, FPM has the superior right to use the mark.[5]

Moreover, even if Ader had not validly purchased the rights to the mark from Candle Light Tavern, Inc., his use of the Candle name and logo at another of his bars, the Cross Road, nevertheless antedates the use by G's Bottoms Up at their club at 168 Amsterdam. In 1978, following the demise of the Old Candle, Ader created a separate Candle Lounge at the Cross Road, which he decorated with fixtures from the Old Candle and advertised by using the Candle logo. Thus, independently of any transfer from the owners of the Old Candle, FPM's rights date from Ader's appropriation of the Candle mark in 1978, well prior to the use by MacDonnell and G's Bottoms Up commencing in late 1980.

■ Ascertaining which party has a prior right in the disputed mark is, however, only one step in the inquiry. Before the Court can grant relief under the Lanham Act, it must also determine whether there is a likelihood of confusion by the coextensive uses of FPM and G's Bottoms Up. In assessing the likelihood of confusion, courts generally consider (1) the strength of the mark, (2) the relatedness of the goods, (3) the similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) likely degree of purchaser care, (7) the defendant's intent in selecting the mark, and (8) the likelihood of expansion of the product lines. *Frisch's Rest., Inc. v. Elbys Big Boy of Steubenville*, 670 F.2d 642, 648 (6th Cir.1982); *McGregor-Doniger, supra*, 599 F.2d at 1130. The unique factual background of the instant case strongly suggests a likelihood of confusion.

■ Although the record is devoid of any evidence of actual confusion or proof concerning the strength of FPM's mark, other factors, including the relatedness of the product, the similarity of the marks, and the marketing channels used by FPM and G's Bottoms Up, are virtually identical. FPM operates a licensed saloon at 75th

---

5. Since FPM's rights derive from the use of the mark at the Old Candle, those rights are, of course, encumbered by any limitations on the rights possessed by Candle Light Tavern, Inc. Thus, if, for instance, MacDonnell had merely loaned Candle Light Tavern, Inc. the right to use the logo she had designed for a definite period

of time, then the rights acquired by FPM would be similarly limited. There is, however, no credible evidence in the record to show that any such limitation existed on the right of Candle Light Tavern, Inc. to use the Candle name and logo.

Street and Amsterdam Avenue; G's Bottoms Up operates what purports to be a private social club in the immediate vicinity, just seven blocks to the south. While the forms of the two operations differ, that difference is devoid of substance. The President of G's Bottoms Up admitted that the club is open to anyone who is a gay male and is willing to pay a modest, one-time fee of several dollars. *See* Fleenor Dep. at 38. Both establishments cater to the same clientele—homosexual males—and both offer the same service—providing a place for those men to relax, have a drink, and mingle with others of similar attitude and interests. Both parties operate their establishments under essentially the same name—Candle Club in the case of G's Bottoms Up and Candle Bar in the case of FPM—and use the identical Candle logo. In addition, both establishments publicize their existence by placing advertisements and listings in the same magazine, *see* Def. Exs. A, B and C, and also by distributing flyers to other establishments frequented by the gay community. Under these circumstances, a finding that there is a likelihood of confusion among consumers is unavoidable. These same factors lead the Court to conclude that there is a reasonable basis for believing FPM is likely to be

damaged as a result of the use of the Candle mark by G's Bottoms Up or MacDonnell. *See Johnson & Johnson v. Carter-Wallace, Inc.,* 631 F.2d 186, 190 (2d Cir.1980); *see also Frisch's Rest., supra,* 670 F.2d at 650.

IV. *Conclusion*

■ For the reasons stated above, defendant/counterclaimant FPM is entitled to equitable relief to prevent counterclaim defendants MacDonnell and G's Bottoms Up from diluting the value and goodwill connected to the Candle mark. FPM's failure to demonstrate an actual loss of business attributable to counterclaim defendant's use of the Candle mark does not preclude such relief.[6] *See Johnson & Johnson, supra,* 631 F.2d at 190. Accordingly, MacDonnell and G's Bottoms Up will be permanently enjoined from using the name "Candle," either alone or in combination with other words forming a confusingly similar name, and/or a candle logo[7] to promote a bar, social club, tavern or any similar type of establishment within this District. Plaintiff's claims will be dismissed with prejudice.

FPM is directed to submit a proposed judgment within five days on five days' notice.

SO ORDERED.

---

**6.** FPM's failure to meet this burden does, however, bar any award of monetary damages in this action.

**7.**