**David and Ingrid BURGESS, husband and wife; and Sherwin M. Fellen, an individual; Plaintiffs,**

v.

**L. Lance GILMAN; Cash Administration Services, LLC; Cash Management Services, LLC; Cash Processing Services; and Cash Asset Management, LLC; Defendants.**

**No. 3:03–CV–0707–ECRRAM.**

United States District Court, D. Nevada.

Feb. 22, 2007.

Fritz Clapp, Kihei, HI, M. Jerome Wright, Reno, NV, for Plaintiffs.

Kirstin M. Jahn, Jahn & Associates, and Mark H. Gunderson, Reno, NV, for Defendants.

## ORDER

EDWARD C. REED, JR., District Judge.

This case involves the disputed ownership of the Mustang Ranch's service marks after the government seized that brothel in conjunction with criminal proceedings

against the former owner. We now enter a written version of the order we issued from the bench on December 15, 2006 (# 271). Changes from the decision on the record have been limited to very minor formatting and grammatical edits necessary to render a written decision. These changes in no way effect the substance of any part of the decision.

* * * * * *

This is the time set for the Court to announce its decision in this case.

Plaintiffs David and Ingrid Burgess and Sherwin M. Fellen filed their Complaint (# 2) on December 23, 2003, and a Second Amended Complaint (# 42) on April 26, 2004, seeking a declaratory judgment that Mr. Fellen was the owner of the Mustang Ranch service mark, and that the Burgesses had the exclusive right to use that mark in conjunction with prostitution.

Defendants L. Lance Gilman; Cash Administration Services, LLC; and Cash Management Services, LLC, answered (# 26) the Second Amended Complaint (# 42) on February 20, 2004. Defendant Cash Processing Services ("CPS") answered and filed a counterclaim for infringement and unfair competition under the Lanham Act on May 20, 2004.

Plaintiffs filed a Third Amended Complaint (# 114), on January 28, 2005, and Cash Processing Services again answered and counter-claimed (# 121) on February 18, 2005. The parties have stipulated that Mr. Fellen, subject to certain conditions stated in the stipulation, is dismissed from the action.

Cash Processing Services filed a motion for a preliminary injunction cn July 14, 2004. (# 54.) Judge Hagen denied Defendants' motion on September 27, 2004. (# 82.) Plaintiff then filed motions for a temporary restraining order and a preliminary injunction cn December 21, 2004 (## 94, 95), and CPS renewed its motion for a preliminary injunction shortly there-

after on December 27, 2004. (# 98.) On December 30, 2004, Judge Hagen granted Plaintiffs' motion for a preliminary injunction and denied Defendants' renewed motion. (# 101.) Defendants filed a motion for reconsideration on January 18, 2005 (# 109), which Judge Hagen denied on January 25, 2005 (# 113).

Defendants filed a Notice of Appeal of these decisions on February 2, 2005 (# 115), and the Ninth Circuit affirmed in a memorandum decision on June 17, 2005. *Burgess v. Gilman*, 134 Fed.Appx. 200 (9th Cir.2005). It is likely that this appeal explains why this case has been pending so long. It sounds like this case has been here over three years, and it has, but a considerable portion of that time can be explained by the appeal.

The Plaintiff, on the one hand, and Cash Asset Management and CPS on the other, filed motions, being cross-motions for summary judgment. (## 149, 150, 151.) We denied all of these motions on February 23, 2006. (# 198.)

Defendants then filed a motion to dissolve the preliminary injunction, on July 20, 2006. (# 222.) On November 13, 2006, the parties stipulated to resolve this motion at the same time that the merits were resolved. They also agreed that all claims for damages were to be dismissed, leaving the remaining claims for declaratory relief, injunctive relief, and attorneys fees and costs. (## 258, 259.)

A bench trial was held before this Court on December 12 through 14, 2006.

## I. *Permanent Injunction*

 A party seeking a permanent injunction in these circumstances must meet a four-factor test, demonstrating:

(1) that it has suffered an irreparable injury;

(2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury;

(3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

(4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.,* —— U.S. ——, ——, 126 S.Ct. 1837, 1839, 164 L.Ed.2d 641 (2006). "[O]nce the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted." *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 612 n. 3 (9th Cir.1989).

 The evidence is virtually undisputed that there will be confusion if both parties seek to use the mark at issue in this case. There was evidence presented at the trial that there has been actual confusion between Plaintiffs' and Defendants' operations respecting emergency calls to the County, that independent contractors have been confused, and that cab drivers bringing customers to the establishments have been confused.

As Judge Hagen stated previously in this case: "It almost goes without saying that two brothel operations in the immediate vicinity of each other using the same name will result in confusion for customers and others."

## II. *Transfers of the Mark*

 Where a business as a whole is transferred without mentioning the transfer of the mark, it is presumed that the mark and good will associated with that mark are transferred as well. *American Dirigold Corp. v. Dirigold Metals Corp.,* 125 F.2d 446, 453 (6th Cir.1942); J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 18:37 n. 1 (4th ed.2006) (hereinafter "*McCarthy* § ") (cit-

ing cases). The same rule applies where transfers are involuntary. *See id.* § 18:37 at n. 6; *American Dirigold,* 125 F.2d at 453.

If the former owner of the brothel, A.G.E., owned the Mustang Ranch mark, there appears to be little basis to conclude that the Department of the Treasury did not receive the Mustang Ranch mark when A.G.E. forfeited the entire business. Neither, so long as A.G.E. owned the mark and the Department of the Treasury did not very quickly abandon it, is there a basis to conclude that the Bureau of Land Management did not receive the mark implicitly from the Department of the Treasury merely because the mark was not mentioned in the inter-agency agreement, which transferred jurisdiction over the property.

 The registration of a fictitious business name with the county does not control the ownership of the mark. *See* 1 *McCarthy* § 9:8 ("The vast majority of courts have stated that the acceptance of a corporate name by a state agency will be given no judicial weight at all in litigation over rights to the name."); *cf. Committee for Idaho's High Desert, Inc., v. Yost,* 92 F.3d 814 (9th Cir.1996) (the fact that a non-profit had inadvertently lost its corporate status was irrelevant to issue of abandonment of that group's name as a mark).

## III. *Rule Against Assignments In Gross*

 Next we deal with the service mark assignment at the government's auction. We, here, address the rule against assignments in gross. A trademark, unlike a patent or copyright, is not "a right in gross or at large." *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918). In *United Drug,* the Supreme Court explained the common law rule against assignments of a mark in gross:

There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business.

*Id.* Federal courts have continued to apply this rule under the 1946 Lanham Act, and it "is well settled ... that no rights [to a mark] can be transferred apart from the business with which the mark has been associated." *Mister Donut of America, Inc., v. Mr. Donut, Inc.,* 418 F.2d 838, 842 (9th Cir.1969).

 Where a trademark is assigned as a mere term, without any particular associated good will, the assignment may be ineffective, causing the mark to remain with the purported assignor. *See R & R Partners, Inc. v. Tovar,* 447 F.Supp.2d 1141, 1149 (D.Nev.2006) (holding that an assignment from a government agency to a private firm of the mark "what happens here stays here" merely for the purpose of policing the mark was ineffective). Alternatively, the mark may be deemed involuntarily abandoned. *See Defiance Button Machine Co. v. C & C Metal Products Corp.,* 759 F.2d 1053, 1059 (2nd Cir.1985). One clear requirement that arises from this principle is that a mark cannot be assigned for use by a business with fundamentally dissimilar goods and services. *Id.*

While an assignment of a mark must always carry with it the accumulated good will associated with it, the rule against assignments in gross (or "naked" assignments) has not been interpreted in recent cases to require the transfer of all or, in some cases, any specific company assets other than the business' good will. *See Matter of Roman Cleanser Co.,* 802 F.2d 207, 209 (6th Cir.1986) (holding that the transfer of machinery to make a cleanser was not necessary to make assignment of the trademark valid; it was enough that the formula and customer lists were transferred); *Defiance Button Machine Co.,* 759 F.2d at 1059 ("[A] trademark may be validly transferred without the simultaneous transfer of any tangible assets, as long as the recipient continues to produce goods of the same quality and nature previously associated with the mark."); *The Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666, 676 (7th Cir.1982) (holding that as long as the goodwill of the business passes to the assignee, "it is not necessary to the continuing validity of the mark that tangible assets of the assignor pass to the assignee"); *PepsiCo, Inc. v. Grapette Co.,* 416 F.2d 285, 288 (8th Cir.1969) ("Inherent in the rules involving the assignment of a trademark is the recognition of protection against consumer deception. Basic to this concept is the proposition that any assignment of a trademark and its goodwill (*with or without tangibles or intangibles assigned*) requires the mark itself be used by the assignee on a product having substantially the same characteristics.") (emphasis added); *Sterling Brewers, Inc. v. Schenley Industries, Inc.,* 58 C.C.P.A. 1172, 441 F.2d 675, 680 (Ct.Cust.App.1971) (finding no problem with assigning beer mark to one business entity and brewery assets to another). *But see La Fayette Brewery v. Rock Island Brewing Co.,* 24 C.C.P.A. 925, 87 F.2d 489 (Ct.Cust.App. 1937) (coming to the opposite conclusion on similar facts).

 In the Ninth Circuit, "[i]t is not necessary that the entire business or its

tangible assets be transferred; it is the goodwill of the business that must accompany the mark." *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1289 (9th Cir.1992).

In a case involving an alleged voluntary abandonment prior to an assignment, the Ninth Circuit has also very recently cautioned that nothing prevents a business from liquidating the majority of its assets before assigning a mark and eventually closing. *Electro Source v. Brandess–Kalt– Aetna Group, Inc.,* 458 F.3d 931, 939 (9th Cir.2006). The *Electro Source* court based its holding in part on the finding that the liquidation in that case was itself a bona fide use of the mark where the trade-marked good itself was being sold, but the court also went on to observe that "[i]t is not unusual for a troubled or failing business to sell and assign its trademark, along with the corresponding goodwill and the remaining business," *id.* at 941. The court saw no problem with that. While *Electro Source* did not explicitly deal with involuntary abandonment and the rule against assignments in gross, it does demonstrate that a business can be shut down and the business' mark will nevertheless live on after the assignment.

If the federal courts have generally applied a less strict version of the rule against assignments in gross than the old but frequently cited language of *United Drug* might suggest, this can in part be chalked up to the text of the Lanham Act, enacted in 1946, which provides for assignments and states that business good will is the corpus of the transfer without mentioning other business assets. *See* 15 U.S.C. § 1060(b) ("A registered mark or a mark for which an application to register has been filed shall be assignable with the good will of the business in which the mark is used, or with that part of the good will of the business connected with the use of and symbolized by the mark.").

While "good will" is defined in terms of a particular business, it has long been defined independent of that business' assets. McCarthy's treatise, for example, quotes Justice Story's nineteenth-century definition of good will, which reads:

> The advantage or benefit, which is acquired by an establishment, *beyond the mere value of the capital stock, funds, or property employed therein,* in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation, for skill and/or affluence, or punctuality, or from other practical circumstances, or necessities, or even from ancient partialities or prejudices.

1 *McCarthy* § 2:19 (4th ed.) (quoting *Story on Partnership* § 99 (6th ed. 1868) (emphasis added)). In a tax case, the Supreme Court has more recently stated: "Although the definition of goodwill has taken different forms over the years, the shorthand description of good-will as 'the expectancy of continued patronage,' provides a useful label with which to identify the total of all the imponderable qualities that attract customers to the business." *Newark Morning Ledger Co. v. United States,* 507 U.S. 546, 555, 113 S.Ct. 1670, 123 L.Ed.2d 288 (1993).

Plaintiffs' trial brief argues that the court should be guided by the principle that a service mark, unlike a copyright or a patent, is not "property." At least one well-known commentator on trademarks, Professor Mark Lemley of Stanford Law School, has simultaneously recognized and lamented the "propertizing" trend towards greater assignability of trade and service marks, writing:

> We give protection to trademarks for one basic reason: to enable the public to identify easily a particular product from

a particular source.... [T]he economic case for brands and advertising is undone to the extent that trademarks are used in ways that affirmatively confuse consumers. Vesting trademarks with the mantle of property—and giving them some of the indicia of real property, such as free transferability—defeats the purpose of linking trademarks to goods in the first place.

Mark A. Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687, 1695–6 (1999).[1]

For its part, however, the Ninth Circuit has identified the "two cornerstone interests" in federal trademark law as, one, "protection of the public through source identification of goods," and two, "protection of the ... investment in the trademark." *Electro Source v. Brandess–Kalt–Aetna Group, Inc.*, 458 F.3d 931, 941 (9th Cir.2006); *see also New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 305 (9th Cir.1992) (stating that the Lanham Act protects against the unfair use of a rival's mark where "the infringer capitalizes on the investment of time, money and resources of his competitor").

It should be observed that protecting business X from business Y's unfair profit from X's good will is a rationale for trademarks that is related to, but nevertheless independent of protection of consumers from confusion. X can suffer an injury to its accumulated good will even if both X and Y have their identical goods produced by factory Z. In *HMH Pub. Co., Inc. v.*

*Brincat*, 504 F.2d 713 (9th Cir.1974), the Ninth Circuit colorfully stated:

Trademark infringement is a peculiarly complex area of the law. Its hallmarks are doctrinal confusion, conflicting results, and judicial prolixity. The source of this difficulty is that each case involves an effort to achieve three distinct objectives which, to a degree, are in conflict. These are: (1) to protect consumers from being misled as to the enterprise, or enterprises, from which the goods or services emanate or with which they are associated; (2) to prevent an impairment of the value of the enterprise which owns the trademark; and (3) to achieve these ends in a manner consistent with the objectives of free competition. The third objective dictates a degree of restraint in the pursuit of the first two; the second can be pushed beyond the reasonable needs of the first; and each requires for its proper implementation the exercise of judicial intuition supported, to the extent possible, by relevant facts.

*Id.* at 716.

"Prostitution services" remain the essence of the business, and as we have already noted in denying summary judgment, there is strong evidence of fame in the Mustang Ranch mark (e.g., the inflated value of the auctioned assets such as the hot tub health certificate), which would appear to translate into business good will. The buildings would also appear to represent a core aspect of the business. Mr.

---

**1.** Professor Lemley's arguments regarding trademarks have been cited by several courts, but only in the First Amendment and trademark dilution context. Attempting to ground trademark theory in economic theory is not necessarily straightforward. The trend towards rational actor orthodoxy in the field of economics has had some novel results in attempts to explain what advertising and trademarks are all about. Some economists attempt to argue with a straight face that advertising functions to convey product "information." A more contorted theory is that advertising signals the ability and resources a company has to advertise, which in turn yields a consumer inference about a product's quality. *See generally* Lemley, *supra*, at 1690 (describing the trend in economic theory, and arguing that trademark law should follow that trend).

Brandt and Mr. Gilman both testified that the octagon, the parlor, the bar, and the tubs constitute an important part of the atmosphere or aura of Mustang Ranch business. Mr. Brandt testified that the trademark was tied to the buildings and the guard tower. Mr. Gilman also testified that the pink buildings' spoke design and signage were all associated with the goodwill of the business, and moving these things to a new location was all that was necessary. The buildings, of course, were sold with the trademark at the eBay auction.

While source identification and protection of consumers against deception is a rationale for trademark law, recent cases make clear that it is not the only rationale. In addition, recent cases have not held that protection against consumer deception implies continuity of tangible business assets. *See Defiance Button,* 759 F.2d at 1060 ("As long as the mark has significant remaining value and the owner intends to use it in connection with substantially the same business or service, the public is not deceived.").

We conclude, therefore, that there was no assignment in gross in this case and that, hence, the government's assignment to Mr. Gilman did not constitute an involuntary abandonment of the mark. Additional cases cited by the defendants at oral argument add some support to these conclusions. These cases announce a test: whether the assets purchased with the name are sufficient to enable the purchaser to go on in real continuity with the prior business, or whether the assets acquired would serve to recreate a unique atmosphere of the former business to identify the new business with it. *See G's Bottoms Up Social Club v. F.P.M. Industries, Inc.,* 574 F.Supp. 1490, 1496 (D.C.N.Y.1983); *Merry Hull & Co. v. Hi–Line Co.,* 243 F.Supp. 45, 51–52 (D.C.N.Y.1965); *American Sleek Craft, Inc. v. Nescher,* 131 B.R.

991 (D.Ariz.1991). The acquisition of the unique Mustang Ranch buildings appears to substantially meet these sorts of tests.

## IV. *Voluntary Abandonment*

██ The Lanham Act provides:

A mark ·shall be deemed to be "abandoned" . . . :

> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C. § 1127. "Abandonment of a trademark, being in the nature of a forfeiture, must be strictly proved." *Prudential Ins. Co. of America v. Gibraltar Fin. Corp. of Cal.,* 694 F.2d 1150, 1156 (9th Cir.1982). The Ninth Circuit has noted that it "has not spoken as to what 'strictly proved' means," *Electro Source,* 458 F.3d at 935 n. 2, but other courts have applied a "clear and convincing evidence" standard as the burden of proof. *Id.E.g. EH Yacht, LLC v. Egg Harbor, LLC,* 84 F.Supp.2d 556, 564 (D.N.J.2000) (citing *McCarthy* § 17:12 (4th ed.1999)).

██ If the party alleging abandonment establishes a prima facie case of abandonment by showing a three-year period of non-use, then "a rebuttable presumption of abandonment is created." *Abdul–Jabbar v. Gen. Motors Corp.,* 85 F.3d 407, 411 (9th Cir.1996); *Star–Kist Foods, Inc. v. P.J. Rhodes & Co.,* 769 F.2d 1393, 1396 (9th Cir.1985). The presumption places a burden of production on the party contesting abandonment. *Emergency One, Inc. v. Am. FireEagle Ltd.,* 228 F.3d 531, 535–37 (4th Cir.2000).

In *Abdul–Jabbar*, the Ninth Circuit noted the following circuit split:

In some circuits, a showing of nonuse shifts the burden of persuasion to the trademark owner to show intent to resume; in others, including the Ninth, Second and Seventh, prima facie abandonment creates only a rebuttable presumption of abandonment.

85 F.3d at 411 n. 4. In other words, it appears that in the Ninth Circuit the burden of production is shifted, but not the burden of persuasion. Alternatively, one might conclude that there is no burden shifting, as the Ninth Circuit cases do not explicitly state that any burden is shifted, but it is hard to see what difference this might make.

■ "[A] prima facie case of abandonment may be rebutted by showing [ (1) ] valid reasons for non-use or [ (2) ] lack of intent" to resume use within the reasonably foreseeable future. *Abdul–Jabbar*, 85 F.3d at 411; *Electro Source*, 458 F.3d at 937–9.

■ When the alleged period of nonuse is less than three years, no presumption of abandonment attaches and the challenging party must show by clear and convincing evidence (1) non-use and (2)intent not to resume use in the reasonably foreseeable future. *Chere Amie, Inc. v. Windstar Apparel. Corp.*, 191 F.Supp.2d 343, 349 (S.D.N.Y., 2001) (citing *Stetson v. Howard D. Wolf & Assocs.*, 955 F.2d 847, 850 (2nd Cir.1992)).

### A. Intent to Resume Use in the Reasonably Foreseeable Future

■ Determining intent or valid reasons for nonuse requires a factual determination. *See Star–Kist Foods*, 769 F.2d at 1396. The Ninth Circuit has recently emphasized that intent only comes into play when non-use has been established, and that the Lanham Act requires "complete discontinuance of use" for aban-

donment. *Electro Source*, 458 F.3d at 937–9. In other words, a single legitimate use will rebut a claim of abandonment, and "a prospective declaration of intent to cease use in the future, made during a period of legitimate trademark use, does not meet the intent not to resume standard." *Id.*

■ Intent not to resume use, unlike "intent to abandon," is framed in the negative. Thus, the intent requirement for abandonment under the Lanham Act can be met by showing an intent only to "warehouse" a mark. *See generally Silverman v. CBS Inc.*, 870 F.2d 40, 46 (2d Cir.1989) (discussing Congress' choice of the "intent not to resume" standard over the intent to abandon standard).

■ Where there are future and successor interests in a property, the intent of all of the parties is relevant in evaluating whether there is intent to resume use. *See EH Yacht LLC v. Egg Harbor, LLC*, 84 F.Supp.2d 556, 566 (D.N.J.2000) ("[A] determination of intent not to resume use should be based on the totality of objective evidence of intent to resume use, not simply the intent of the registered trademark owner. Under this standard, so long as there is power to do so, any valid intent to resume use within a reasonable time becomes relevant.").

We consider reasonableness to encompass the issue of excused non-use, which we discuss below.

### B. Use

■ The kind of "use" that a party must demonstrate under section 1127 is "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. "Thus, neither promotional use of the mark on goods in a different course of trade nor mere token use consti-

tute 'use' under the Lanham Act." *Emergency One*, 228 F.3d at 536.

In our prior order denying summary judgment, we found that the *attempt* to auction off the Mustang Ranch was not a bona-fide use, but that CPS made bona-fide use of the mark once it gained possession of the property. Thus, although we also found that a period of this non-use was excused, the period of overall non-use, excused or not, was from August of 1999 to October of 2003—that is, a few months shy of four years.

The evidence presented at the bench trial gives us no reason to change these findings.

### C. *Excused Non–Use*

■ In general, temporary suspension of use for reasons beyond the control of the mark owner is excused and does not lead to abandonment. *See McCarthy* § 17:16 (citing myriad cases and summarizing the rule as follows: "[a]bandonment does not result from a temporary forced withdrawal from the market due to causes such as war, prohibition, a labor strike, bankruptcy, import problems, unprofitable sales, being sued for patent infringement, or some other involuntary action."). The Second Circuit, for example, found the presumption of abandonment to be rebutted where New York stopped operating a water business due to a legislative decision, and where the state had sought continuously thereafter to sell the business with its goodwill and trademark. *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2nd Cir.1980).

■ We continue, as we did previously, to adopt Judge Hagen's finding in his order granting the motion for a preliminary injunction that the government's lack of control over the assets during the period of time between the Preliminary Order of Forfeiture (August 1999), and the Final Order of Forfeiture (June 28, 2001), presents a valid reason for nonuse during that period. (Order of Feb. 23, 2006, at 12 (# 198).) While the two years between the Final Order of Forfeiture and the eBay auction may seem like a substantial period of nonuse for a private company, it is certainly plausible that it would take the multi-faceted political bureaucracy charged with control of the Mustang Ranch at least two years to assess its assets, engage the public in a discussion over use, divide the assets, and sell the brothel portions to an entity that could operate a brothel. We note in that connection that June 29, 2001 was the date Joe Conforte's conviction was affirmed by the Ninth Circuit, and the Final Order of Forfeiture on March 9, 2001 had been stayed pending appeal until that time.

The facts of this case present a unique situation, in that a government agency was asked to do something with an inherited business of ill repute, and doing just about anything with that business would generate raised eyebrows, public interest, and as the Court's record has documented, substantial press interest. Certainly, many of these issues were beyond the agency's control. On top of the political issues, the physical property appears also to have come with flooding issues as well as issues of asbestos, and although the parties have not discussed this fact, some amount of public comment in a planning process was likely required by FLPMA. 42 U.S.C. § 1712 (land use plans must be developed and maintained), § 1715 (acquisitions must be consistent with applicable land use plans).

Trademark law is usufructuary, and it does not allow for the "warehousing" of rights in a manner that is often perfectly acceptable in other areas of "intellectual property" law, such as patent law. *See Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F.Supp.2d 247, 270 n. 38

(S.D.N.Y.2002) ("Warehousing, which is impermissible, occurs when one hoards a mark for future use without concrete intent to use it in the future."). The plausible reading of the current record is that (1) the government (for whatever reason) did not even know if it had the mark initially, and that (2) the government had discussions about various proposed plans for the property—e.g., a tourist attraction, a center for wild horses, a battered woman's shelter, an area for flood control, and a habitat reserve—which may or may not have involved the continued existence of a brothel in other hands. The government seems to have been, in a word, simply indecisive.

Some courts have required "concrete plans" to resume use where a trademark appears to have been warehoused, and if this standard were to be considered applicable, it could be argued that the government did not have sufficiently "concrete" intent to resume use within the reasonably foreseeable future. *See Silverman v. CBS Inc.*, 870 F.2d 40, 46 (2d Cir.1989) (stating that "without any *concrete plans* to resume use, a company could almost always assert truthfully that at some point, should conditions change, it would resume use of its mark," but this would not show intent to resume use in the reasonably foreseeable future) (emphasis added). *Silverman* is, however, distinguishable in that, one, it did not deal with a government forfeiture, and as importantly, two, the period of non-use was a full 21 years. 870 F.2d at 46. By contrast, the period of non-use in this case was fairly short.

The government should probably not be penalized for pausing to reflect and deliberate when placed in this kind of unique situation. Further, when the general background principles of public ownership of real property are taken into account, it appears to be very unlikely that Congress would have intended the Lanham Act to compel a forfeiture in a case such as this one. If the law generally "abhors a forfeiture," in most areas of both state and federal property law there are even greater, virtually insurmountable barriers to claiming that agents of the government have simply forfeit public property rights through inaction. *See, e.g., United States v. Vasarajs*, 908 F.2d 443, 446–47 & nn. 3, 4 (9th Cir.1990) ("prescriptive rights cannot be obtained against the federal government," nor can "adverse possession ... be achieved against the federal government"); R.P. Davis, *Acquisition by adverse possession or use of public property*, 55 A.L.R.2d 554 § 2 (1957) (summarizing that "[w]ith respect to states, the great preponderance of authority is to the effect that, absent legislation so permitting, title to lands held by the state in any capacity cannot be obtained by adverse possession or prescription, as the state cannot be bound by the defaults or negligence of her officers or agents"). The rule against prescription against the government, of course, is in no way directly controlling, but it probably should at least inform how the Lanham Act is read in a unique case such as this one.

We do not find clear and convincing evidence has been adduced that shows the government had the intent not to resume use of the mark. The continuity of the Mustang Ranch in some form appears to have always been at least on the table. We conclude that indecision on the part of the government was excusable. The government was compelled to deal with multiple problems in inheriting this property, and a certain amount of deliberative indecision was warranted under the circumstances and may have been required by law.

### V. *Conclusion*

We do not reach the issue of whether plaintiffs were the bona fide first users of

the mark after abandonment because we find that there was no abandonment. Further, having found there was no abandonment of the mark, it is not necessary for us to reach the issue of whether the waiver executed by the plaintiffs contained in a right of way grant waived Plaintiffs' claims to the mark.

The Court finds as follows with respect to the pending motion for a permanent injunction:

(1) Plaintiff has caused CPS irreparable injury.

 (2) Monetary damages are inadequate to compensate for this injury. Money damages are considered inadequate for a continuing wrong in a trademark case, and we so find here, because denying injunction relief would force the wronged party to endure continuing infringement and to bring successive suits for money damages. *Foxtrap, Inc., v. Foxtrap, Inc.,* 671 F.2d 636, 639 (D.C.Cir.1982) (citing 2 *McCarthy* 328–29 (1st ed.1973)). The Lanham Act also provides us with a power to grant injunctions according to the principles of equity, and upon such terms as we deem reasonable. 15 U.S.C. § 1116. We deem an injunction reasonable in this case.

(3) We further find that the balance of hardships tips in favor of CPS. The undisputed evidence is that Mr. Gilman has expended an extraordinary amount of money in anticipation of his planned use of the marks.

(4) We find that the public interest would not be disserved by a permanent injunction.

Therefore, Ms. Clerk, you will enter the orders of the Court as follows:

(1) The Court hereby declares that Defendant Cash Processing Services ("CPS") has the right to use the trademarks Mustang Ranch, World Famous Mustang Ranch, and World Famous Mustang Ranch Brothel. The Court further finds and de-clares that Plaintiffs do not have the right to use these marks because such use would infringe on Defendant CPS' legitimate right to use these marks.

(2) Defendants motion (# 222) to dissolve the preliminary injunction entered in this case is **GRANTED.**

(3) Plaintiffs, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, and each of them, who receive actual notice of this order by personal service or otherwise, are hereby permanently enjoined and restrained from using the trademarks Mustang Ranch, World Famous Mustang Ranch, and World Famous Mustang Ranch Brothel.

The Clerk shall enter judgment accordingly. I thank counsel for your fine presentations. It presented a very interesting and challenging issue to us, which we have endeavored to fairly resolve.

The Court is now adjourned.