# United States Court of Appeals
## For the First Circuit

No. 22-1853

TO-RICOS, LTD.,

Plaintiff, Appellee,

v.

PRODUCTOS AVÍCOLAS DEL SUR, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Montecalvo, Lipez, and Thompson,
Circuit Judges.

Luis A. Oliver-Fraticelli, with whom Adsuar Muñiz Goyco Seda
& Pérez-Ochoa, P.S.C. was on brief, for appellant.

Sheila J. Torres Delgado, with whom Puerto Rico Legal
Advisers, LLC, Walter A. Winslow, and Coan, Payton & Payne, LLC
were on brief, for appellee.

September 19, 2024

**LIPEZ**, **Circuit Judge**.  This case arises from a dispute between two companies vying for the right to use the "Pollo Picú" trademark in the sale of fresh chicken.  Appellant Productos Avícolas del Sur, Inc. ("PAS") sold chicken under the "Pollo Picú" trademark ("Picú mark") until 2011, when the company stopped selling products because of financial difficulties.  Five years later, in 2016, appellee To-Ricos, Ltd. ("To-Ricos") applied to register the Picú mark, believing that PAS had abandoned it.  When PAS opposed To-Ricos's trademark applications, To-Ricos sued PAS in federal district court, seeking a declaratory judgment that it is the rightful owner of the Picú mark.

Concluding that PAS had abandoned the mark, the district court granted summary judgment for To-Ricos.  On appeal, PAS argues that it never abandoned the Picú mark because the company's financial adversity excused its nonuse of the mark.  PAS also asserts that, between 2011 and 2016, the company manifested its intent to resume, not abandon, use of the Picú mark.  We disagree with PAS on both points and thus affirm the district court's grant of summary judgment for To-Ricos.

## I.

We summarize the relevant facts, which are undisputed unless otherwise noted, in the light most favorable to PAS, the non-moving party.  See González-Arroyo v. Drs.' Ctr. Hosp. Bayamón, Inc., 54 F.4th 7, 18 (1st Cir. 2022).

- 2 -

**A. PAS Stops Using the Trademark**

PAS is a Puerto Rico corporation that sold Picú branded chicken from 2005 to 2011.[1] The Picú trademark consists of the phrase "Pollo Picú" along with a cartoon chicken:



The brand was, at one point, well-recognized among Puerto Ricans, with one industry executive going so far as to call "Pollo Picú" the "Coca-Cola" of Puerto Rico chicken. However, PAS faced administrative and financial challenges maintaining the Picú tradition. For example, the U.S. Patent and Trademark Office ("USPTO") cancelled PAS's registrations of the Picú mark in 2006 and 2009 for failure to file a declaration, as required by Section 8 of the Lanham Act, attesting that the mark was either: (1) in use, or (2) not in use due to excusable circumstances.[2]

---

[1] PAS temporarily paused sales for fourteen months within this period because of a sudden increase in the price of corn.

[2] In relevant part, Section 8 of the Lanham Act provides that, at specified times, a registrant must submit an affidavit stating that "the mark is in use in commerce," 15 U.S.C. § 1058(b)(1)(A), or that the "mark is not in use in commerce," id. § 1058(b)(2)(A), "due to special circumstances which excuse such

PAS ultimately stopped selling chicken bearing the Picú mark in 2011 after its bank -- Banco Popular de Puerto Rico ("the Bank") -- froze PAS's financing.[3]  It soon became apparent that the Bank was auditing PAS's credit accounts.  In January 2012, the Bank sued PAS in the Puerto Rico Commonwealth Court of First Instance ("Commonwealth Court") for the collection of monies and foreclosure of security interests under a preexisting loan and security agreement between the entities.  Under that agreement, PAS had secured a loan by granting the Bank a lien over its assets, including the Picú mark.  The Bank's lien entitled it to recover any income PAS garnered from its assets if PAS breached the loan agreement.

Confronting financial challenges and pending litigation, the president of PAS -- Fernando Echegaray -- considered selling the company to To-Ricos, PAS's main competitor.[4]  In March 2012, Echegaray discussed a sale of PAS's assets with Pedro Del Valle López ("Del Valle"), the president of To-Ricos, indicating that PAS would either sell its assets or resume production.  With Del

nonuse and is not due to any intention to abandon the mark," id. § 1058(b)(2)(B).

[3] The financial institution at issue had different names and owners during the period relevant to this litigation.  Those changes in name and ownership are not relevant to this appeal, so we refer to the entity as "the Bank" for simplicity.

[4] PAS and To-Ricos had also discussed the sale of the Picú mark in prior years.

Valle's encouragement, Echegaray sent an offer letter to the president of To-Rico's's parent company. However, no sale materialized.

PAS spent the next two-and-a-half years litigating with the Bank. Eventually, in October 2014, PAS and the Bank signed a settlement agreement requiring PAS to pay a stipulated sum to the Bank by December 2014. Under the agreement, if PAS failed to make that payment, the Bank would foreclose on most of PAS's assets to satisfy the judgment, after which PAS would be released from all debts and obligations to the Bank. The Picú mark was not among the foreclosable assets. The agreement provided, however, that the Bank would retain its lien over the mark until the foreclosure proceedings concluded.

PAS failed to make the December 2014 payment. By mid-2017, the Bank had still not exercised its right to foreclose on PAS's assets. The Picú mark remained encumbered by the Bank's lien during that period. Due to the Bank's inaction, PAS moved for the Commonwealth Court in June 2017 to order the Bank to foreclose on PAS's assets or declare PAS free of its obligations to the Bank.[5] In November 2019, the Commonwealth Court finally granted PAS's motion, ultimately discharging PAS from its

---

[5] For procedural reasons irrelevant to this appeal, the Commonwealth Court did not rule on PAS's motion for more than two years.

outstanding obligations, thus removing the Bank's lien over the mark.

## B. To-Ricos Applies to Register the Trademark and PAS Responds

Meanwhile, To-Ricos filed an application in April 2016 to register the Picú mark with the USPTO. No other trademarks bearing the term "Picú" were registered with the USPTO at the time To-Ricos filed its application.[6] However, just three months later, in July 2016, PAS filed its own application to register the Picú mark.[7] And, in October 2016, PAS filed an opposition to To-Ricos's application with the Trademark Trial and Appeal Board ("TTAB"), an administrative tribunal housed within the USPTO.[8]

About one year later, in September 2017, PAS executed a trademark licensing agreement with IMEX Americas Trading, LLC ("IMEX"), a company in the import/export industry.[9] The agreement granted IMEX a non-exclusive right to use the Picú trademark in

---

[6] As noted, the USPTO cancelled PAS's earlier registration of the Picú mark in 2006 and 2009 for failure to file certain declarations required by the Lanham Act.

[7] PAS applied to register the term "Picú" in addition to "¡Ahora Más Sabroso!" The parties treat the marks as identical to one another, so we do the same.

[8] In June 2016, To-Ricos applied to register the same mark with the Puerto Rico Patent and Trademark Office ("PRTO"). PAS opposed that application, as it did with To-Ricos's application with the USPTO. Because the parties make no argument related to the PRTO application, we focus our analysis on the dispute over federal registration.

[9] IMEX is owned by Echegaray's nephew, Derick Lugo-Colón.

the United States.  IMEX started selling chicken under the Picú mark in March 2018.[10]  However, IMEX stopped selling Picú branded chicken just a few months later, around June 2018, after To-Ricos sent cease and desist letters to clients of the company.

**C. This Litigation**

The following summer, in June 2019, To-Ricos began selling Picú branded chicken.  That same month, To-Ricos filed the present federal lawsuit against PAS.  To-Ricos's complaint sought, among other remedies, a declaratory judgment establishing To-Ricos as the legal owner of the Picú mark.[11]

After the parties completed discovery, To-Ricos moved for summary judgment, arguing that PAS had abandoned the Picú mark by the time To-Ricos applied to register the mark in April 2016.[12] PAS, in opposing the motion, asserted that its litigation with the Bank excused its nonuse of the mark, and that its conduct since 2012 demonstrated that it did not abandon the mark.

---

[10] To be precise, IMEX sold chicken under the Picú mark through a separate distributor and a separate supplier.  The names of those entities are irrelevant to this appeal.

[11] In November 2020, the TTAB stayed the administrative proceeding between PAS and To-Ricos pending the conclusion of this litigation.

[12] PAS filed its own motion for summary judgment on a counterclaim it had asserted against To-Ricos.  PAS's motion, which the district court denied, is not relevant to this appeal.

The district court entered summary judgment for To-Ricos. To-Ricos, Ltd. v. Productos Avícolas del Sur, Inc., No. 19-1592, 2022 WL 19355737, at *3 (D.P.R. Sept. 22, 2022). The court noted that To-Ricos had established "a prima facie showing of abandonment" given that PAS admitted to not using the mark in commerce for at least three consecutive years before To-Ricos applied to register the mark. Id. at *2 (quoting Gen. Motors Corp. v. Aristide & Co., Antiquaire De Marques, 87 U.S.P.Q.2d 1179, *3 (T.T.A.B. 2008)). Finding that PAS had not met its burden of production with the evidence required to show its intent to resume use of the mark within that three-year period, the court held that To-Ricos was entitled to summary judgment on its abandonment claim. Id. at *2-3. The court therefore entered a declaratory judgment pronouncing To-Ricos as the lawful and rightful owner of the Picú mark.[13] This appeal followed.

## II.

### A. Standard of Review

We review a district court's summary judgment decision de novo. Gerald v. Univ. of P.R., 707 F.3d 7, 16 (1st Cir. 2013).

---

[13] The judgment, in relevant part, provided that: "(i) Plaintiff To-Ricos Ltd. is the legal and rightful owner of the 'Pollo Picu' mark in connection with the sale, marketing, and promotion of poultry and poultry-related products in the United States, including the Puerto Rico territory; (ii) Plaintiff To-Ricos Ltd. has superior and priority rights in the 'Pollo Picu' mark; and (iii) Defendant Productos Avicolas del Sur, Inc. does not have any rights over the 'Pollo Picu' mark."

Though the issue of trademark abandonment involves questions of fact, it can be resolved via summary judgment when there is no genuine dispute of material fact such that the moving party is entitled to judgment as a matter of law. See Yellowbook Inc. v. Brandeberry, 708 F.3d 837, 848 (6th Cir. 2013); see also Fed. R. Civ. P. 56(a). A genuine dispute is one which "a reasonable jury could resolve . . . in the favor of the non-moving party," and a material issue is one with the "potential to affect the outcome . . . under the applicable law." Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). When the moving party "bears the burden of proof at trial," as To-Ricos does here on the issue of abandonment, the movant "must demonstrate every element of [its] case such that 'no reasonable trier of fact could find other than for [the moving party].'" Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 411 (1st Cir. 2015) (quoting Lopez v. Corporación Azucarera de P.R., 938 F.2d 1510, 1516 (1st Cir. 1991)).

Our analysis "look[s] to all of the record materials on file, including the pleadings, depositions, and affidavits," without "evaluat[ing] the credibility of witnesses nor weigh[ing] the evidence." Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014). Though we draw all reasonable inferences in PAS's favor as the non-moving party, Harley-Davidson Credit Corp., 807 F.3d at

- 9 -

408, the "test for summary judgment is steeped in reality," so the non-moving party cannot rely on "conclusory allegations, improbable inferences, and unsupported speculation" to establish a dispute of material fact. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

## B. Trademark Abandonment Framework

A trademark includes any "word, name, symbol, or device" used to "identify and distinguish" goods. 15 U.S.C. § 1127. Though trademark rights may be established under the Lanham Act or common law, "the right is conditioned upon use [of the mark] in commerce" in both circumstances. Gen. Healthcare Ltd. v. Qashat, 364 F.3d 332, 335 (1st Cir. 2004).[14] Only the "bona fide" use of a mark will establish such a right; token uses that "merely" aim "to reserve a right in a mark" will not suffice. See 15 U.S.C. § 1127 (defining "use in commerce" as "bona fide use of a mark in the ordinary course of trade").

---

[14] Neither party has identified distinctions between the Lanham Act and the common law relevant to the issues raised in this appeal. Our analysis here focuses on the parties' rights under the Lanham Act. See Qashat, 364 F.3d at 336 n.6 (drawing on the Lanham Act despite the invocation of common law rights because "the general principles qualifying a mark for registration under the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection" (quoting Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992))).

Likewise, an owner may lose rights to a trademark once they stop using it in commerce. See ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 146-47 (2d Cir. 2007). A trademark is considered "abandoned" if "its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. An abandoned mark returns to the public domain, where it may "be appropriated for use by other actors in the marketplace, in accordance with the basic rules of trademark priority." ITC, 482 F.3d at 147 (citation omitted).

In some cases, as here, a successive user of a mark may seek a declaratory judgment deeming the mark abandoned by its (purportedly) former owner. See, e.g., Kellogg Co. v. Exxon Corp., 209 F.3d 562, 575 (6th Cir. 2000).[15] To prevail in that endeavor, "[t]he party asserting abandonment bears the burden of persuasion with respect to two facts: (1) non-use of the mark by the legal owner, and (2) lack of intent by that owner to resume use of the mark in the reasonably foreseeable future." ITC, 482 F.3d at 147.[16]

---

[15] Put differently, the plaintiff in an infringement suit can "offensively" raise the claim that the defendant has abandoned any right it may once have had in the mark. See Yellowbook, 708 F.3d at 848 ("[T]he issue of abandonment may be asserted offensively . . ..").  An abandonment claim may also be raised "defensively" as an affirmative defense in infringement litigation. See 15 U.S.C. § 1115(b)(2) (listing abandonment as an affirmative defense in infringement actions); see also Yellowbook, 708 F.3d at 847-48 (describing still other contexts in which an abandonment claim may be asserted).

[16] To-Ricos has also raised an analogous abandonment claim under Puerto Rico law.  The parties agree that the statutory

- 11 -

The Lanham Act provides that a challenger may establish a prima facie case of abandonment by showing that the mark has not been used for three consecutive years.  See 15 U.S.C. § 1127.[17] Such a prima facie showing creates a "rebuttable presumption" that the prior owner has abandoned the mark.  ITC, 482 F.3d at 147 (quoting Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980)).[18]  To rebut the presumption, the prior owner must produce evidence that, within the statutory period, it either used the mark or held an intent to resume use of the mark in the reasonably foreseeable future.  See Emergency One, Inc. v. Am. FireEagle, Ltd., 228 F.3d 531, 536-37 (4th Cir. 2000); see also ITC, 482 F.3d at 149 n.9 (explaining that "a mark holder's intent to resume use of the mark must be formulated during the three-year

definition of abandonment is essentially the same under the Lanham Act and the Puerto Rico Trademark Act.  See Puerto Rico Trademark Act, 10 L.P.R.A. § 223(K).  Thus, our analysis of To-Rico's federal claim applies equally to its claim under Puerto Rico law.

[17] Earlier versions of Section 1127 provided that two consecutive years of nonuse established prima facie evidence of abandonment.  Effective January 1, 1996, Congress amended Section 1127 to lengthen the required period of nonuse from two consecutive years to three.  See Uruguay Round Agreements Act, Pub. L. No. 103-465, § 521, 108 Stat. 4809, 4981-82 (1994); see also Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc., 304 F.3d 1167, 1174 n.8 (11th Cir. 2002) (noting the amendment to the statute).

[18] If the alleged period of nonuse is shorter than three years, no presumption is triggered and the challenging party must carry the same burden of proof as would a party for which a prima facie case had been rebutted: "(1) non-use of the mark by the legal owner, and (2) lack of intent by that owner to resume use of the mark in the reasonably foreseeable future."  ITC, 482 F.3d at 147.

- 12 -

period of non-use").[19]   What constitutes the "'reasonably foreseeable future' will vary depending on the industry and the particular circumstances of the case." Emergency One, 228 F.3d at 537 (noting that products with "very long lives" where "the good will value of the mark persists long after production" may give mark owners "five or six years [to] consider[] the reintroduction of a brand, even though the same passage of time would be unreasonable for a maker of a more ephemeral product, say potato chips").

A prima facie case of abandonment shifts only the burden of production, not persuasion, to the prior owner of the mark. Id. at 536; ITC, 482 F.3d at 148.  Put differently, the statutory presumption merely alleviates the challenger's burden of "establish[ing] the intent element of abandonment as an initial part of its case."  Imperial Tobacco Ltd. v. Philip Morris, Inc., 899 F.2d 1575, 1579 (Fed. Cir. 1990).  If a mark owner provides evidence that "would permit a reasonable jury to infer that [the owner] had not abandoned the mark," ITC, 482 F.3d at 149, the owner has satisfied its burden of production and the presumption of abandonment "disappears," Saratoga, 625 F.2d at 1043.[20]

---

[19] We sometimes refer to the three-year period described in Section 1127 as a "statutory period" and the presumption of abandonment as a "statutory presumption."

[20] If the (purportedly) former mark owner satisfies its burden of production, the party asserting abandonment must ultimately persuade the factfinder that the prior owner had discontinued use

Here, PAS admits that it did not use the Picú mark in commerce between 2011 and 2016. Accordingly, the district court concluded that To-Ricos had established a prima facie showing of abandonment. To-Ricos, 2022 WL 19355737, at *2. The burden thus shifted to PAS to produce evidence that, during the relevant period, it possessed an intent to resume use of the mark. Id. Determining that PAS provided no such evidence, the court held that PAS had abandoned the Picú mark. Id. at *3. The court thus granted summary judgment for To-Ricos. Id.

### III.

This dispute turns on whether PAS abandoned its right to the Picú mark before To-Ricos appropriated the mark for its own use. See J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 17:2 (5th ed. 2024) [hereinafter "McCarthy"] ("Once abandoned, a mark may be seized immediately and the person so doing so may build up rights against the whole world. After abandonment, ownership of the mark goes to the first party after the abandonment to achieve priority of use as a mark."); see also ITC, 482 F.3d at 147.

PAS challenges the district court's abandonment holding on two grounds. First, PAS contends that the court should have

---

of the mark with the intent not to resume such use. See Cumulus Media, 304 F.3d at 1176-77; see also Emergency One, 228 F.3d at 540 (discussing proper jury instructions).

excused PAS's nonuse of the mark because the company only stopped using the mark due to its financial insecurity and litigation with the Bank. Second, PAS asserts that it rebutted the presumption of abandonment by producing evidence of its intent to resume use of the mark. Such evidence includes PAS's attempt to sell the mark in 2012, its agreement with the Bank to unencumber the mark in 2014, and its licensing of the mark to IMEX in 2017.

## A. Excusable Nonuse

PAS first argues that its "nonuse should have been excused as justified" because it was entangled in legal proceedings against the Bank. More broadly, PAS asserts that a temporary suspension of use for reasons beyond the control of the mark owner cannot establish a trademark abandonment claim. To-Ricos responds by noting that explanations for nonuse, standing alone, cannot rebut the presumption of abandonment.

A trademark owner may, of course, argue that some external event forced the owner to temporarily withdraw from the market. See McCarthy, supra, § 17:16 (discussing "outside causes"). Indeed, "a labor strike, bankruptcy, import problems, unprofitable sales . . . [and] other involuntary action[s]" may explain why an owner has temporarily stopped using a mark in commerce. Id. (footnotes omitted). PAS, however, interprets that basic proposition to mean that evidence of "excusable nonuse"

- 15 -

prevents the three-year statutory period from running.[21]  In other words, PAS contends that its evidence of "excusable nonuse" prevents To-Ricos from establishing a prima facie case.

We disagree.  The Lanham Act means what it says: "Nonuse for 3 consecutive years shall be prima facie evidence of abandonment."  15 U.S.C. § 1127.  The text does not distinguish between inexcusable and excusable years of nonuse.  Indeed, the statute is agnostic about the reason for a mark's hibernation.  What matters, for the purpose of establishing a prima facie case, is whether the mark was in use or not.

Still, PAS makes another argument.  That is, even assuming its nonuse of the mark established a prima facie case of abandonment, PAS contends that it satisfied its burden of production, and thus rebutted the presumption of abandonment, by furnishing evidence of "excusable nonuse."

This proposition is similarly unavailing.  Once a prima facie case of abandonment has been established, the (purportedly) prior owner of the mark must, at minimum, produce evidence of an intent to resume use of the mark within the "reasonably foreseeable future."  Silverman v. CBS Inc., 870 F.2d 40, 47 (2d Cir. 1989).  To be sure, a justification for nonuse may help a (purportedly) prior owner explain when or how it intends to resume use of the

---

[21]  We use the phrases "excusable nonuse," "justifiable nonuse," and "explainable nonuse" interchangeably.

- 16 -

mark.  ITC, 482 F.3d at 151 n.10 (noting that a mark owner's explanation for why it suspended use of a mark is relevant "only as circumstantial evidence shedding possible light on [its] intent to resume future use [of the mark] within a reasonable period of time").  However, the prior owner cannot satisfy its burden of production simply by providing a reason why it did not use the mark during the statutory period.  Silverman, 870 F.2d at 47 ("A proprietor who temporarily suspends use of a mark can rebut the presumption of abandonment by showing reasonable grounds for the suspension and plans to resume use in the reasonably foreseeable future when the conditions requiring suspension abate." (emphasis added)).

If the rule were otherwise, a mark owner would be free to indefinitely warehouse unused trademarks so long as that proprietor could provide some excuse for the mark's nonuse.  See id. at 46 ("Even after prolonged non-use, and without any concrete plans to resume use, a company could almost always assert truthfully that at some point, should conditions change, it would resume use of its mark.").  Indeed, any revenue shortfall, corporate reorganization, or supply chain disruption could "justify" the nonuse of a mark.  Congress presumably never "contemplated such an unworkable standard" in passing the Lanham Act.  Id.  Rather, a prior mark owner seeking to rebut the presumption of abandonment must, at minimum, produce evidence of

its intent, within the statutory period, to use the mark in the reasonably foreseeable future. That evidentiary requirement "ensures that valuable trademarks are in fact used in commerce as the Lanham Act intends, rather than simply hoarded or warehoused." Emergency One, 228 F.3d at 537.

PAS cites several non-binding cases for the proposition that a mark owner may defeat an abandonment claim simply by showing "a temporary suspension of use for reasons beyond the control of the mark owner." However, each of those cases involved a mark owner that also produced evidence of its intent to resume use of the mark. For example, in Burgess v. Gilman, 475 F. Supp. 2d 1051 (D. Nev. 2007), the mark owner "had discussions about various proposed plans for the [brand]" during the nonuse period. Id. at 1062. Similarly, the mark owner in Kardex Sys., Inc. v. Sistemco N.V., 583 F. Supp. 803 (D. Me. 1984), maintained an "intent to return to [the] market" during a period of nonuse by servicing and advertising the relevant product. Id. at 817; see also Miller Brewing Co. v. Oland's Breweries (1971) Ltd., 548 F.2d 349, 352 (C.C.P.A. 1976) (noting that a mark owner sufficiently "rebut[ted] [a] prima facie case of abandonment" because it continued advertising the mark during the period of nonuse, among other activities expressing an intent to resume use). And, in Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 769 F.2d 1393 (9th Cir. 1985), the Ninth Circuit noted that the entity alleged to have abandoned

- 18 -

marks during a time of financial hardship ultimately "intended to and did resume use of the trademarks when profits could again be made." Id. at 1396.

In sum, we reject PAS's arguments that it need only show a "temporary suspension of use for reasons beyond [its] control" to toll the statutory period of nonuse or rebut the presumption of abandonment. Indeed, PAS's evidence of "excusable nonuse" is neither sufficient nor necessary to satisfy its burden of production. Though PAS's litigation with the Bank may help explain why it stopped using the Picú mark, PAS must still produce evidence of an intent to resume use of the mark to rebut the presumption of abandonment. Of course, PAS asserts that it did in fact produce such evidence of its intent. We thus evaluate below whether PAS's purported evidence of its intent to resume use, combined with its justification for not using the mark, satisfied its burden of production.

**B.  Intent to Resume Use**

We pause to further explain the procedural lens through which we evaluate PAS's proffered evidence of its intent to resume use of the mark. As noted above, to rebut the presumption of abandonment, PAS must produce evidence that, during the statutory period, it held an intent to resume use of the mark in the reasonably foreseeable future. We emphasize again that PAS's burden in this regard is one of production, not persuasion.

Emergency One, 228 F.3d at 536.  That means PAS need not <u>prove</u> anything at this procedural stage.  It must only <u>produce</u> evidence that would "permit a reasonable jury to conclude that, in the three-year period of non-use," PAS "nevertheless maintained an intent to resume use of its registered mark in the reasonably foreseeable future."  <u>ITC</u>, 482 F.3d at 149.

In determining whether PAS satisfied its burden of production, we must view its proffered evidence not in isolation but in its totality -- including, as noted, PAS's reason for suspending its use of the mark.  <u>See</u> <u>id.</u> (viewing the record in its totality to evaluate intent).  Moreover, we must evaluate such evidence in the light most favorable to PAS, the nonmoving party on summary judgment.  <u>See</u> <u>González-Arroyo</u>, 54 F.4th at 18.  The burden of production is thus no "heavy burden."  <u>Empresa Cubana del Tabaco</u> v. <u>Culbro Corp.</u>, 399 F.3d 462, 467 n.2 (2d Cir. 2005). That said, summary judgment must be entered against a party who fails to adduce enough evidence to satisfy this burden.  <u>See</u>, <u>e.g.</u>, <u>ITC</u>, 482 F.3d at 149 (granting summary judgment for the party asserting an abandonment claim because the nonmoving party failed to furnish evidence of its intent to resume use of a mark); <u>Yellowbook</u>, 708 F.3d at 848 (same).[22]

---

[22] We reject PAS's argument that the district court improperly shifted the burden of proof, rather than the burden of production, to PAS.  To be sure, the district court at times referred to PAS's inability to "disprove" certain facts.  <u>To-Ricos</u>, 2022 WL 19355737,

- 20 -

With these procedural requirements in mind, we now turn to the three circumstances that, according to PAS, reflect the company's intent to resume use of the mark.

### 1. Attempted Sale (2012)

PAS first points to its attempt to sell the Picú mark as evidence of its intent to resume use of the mark. As noted, PAS sought to sell its assets, including the Picú mark, to To-Ricos in 2012. During those negotiations, Echegaray, PAS's president, expressed his intention to either "reopen" production or "do something with th[e] assets."

The circuits are divided on whether an attempt to sell a mark expresses an intent to use that mark in commerce. See Specht v. Google Inc., 747 F.3d 929, 934 (7th Cir. 2014) ("[A]n effort to sell the assets of a business is different from trading on the goodwill of a trademark to sell a business's goods or services and therefore does not constitute a use of the mark in commerce."); but see Defiance Button Mach. Co. v. C & C Metal Prods. Corp., 759 F.2d 1053, 1060-61 (2d Cir. 1985) (rejecting

at *2. However, the context surrounding those references makes clear that the district court was referring to PAS's failure to produce evidence showing an intent to resume use. See id. at *3 ("[PAS] has not provided competent evidence of an intent to resume use during the relevant time period." (emphasis added)); id. ("There is no evidence of business plans, marketing strategies, licensing efforts, or other actions undertaken between 2011 and 2016 to establish an intent to resume use of the mark in commerce." (emphasis added)).

abandonment claim, in part, where owner, after a period of nonuse, tried to sell a mark). We need not reach that issue here, however, because PAS tried to sell the Picú mark in 2012, before the relevant three-year statutory window. As discussed, To-Ricos applied to register the Picú mark in 2016. Thus, to rebut the statutory presumption of abandonment PAS needed to produce evidence that, between 2013 and 2016, it either used the mark in commerce or held an intent to resume use of the mark. See ITC, 482 F.3d at 149 n.9.[23] PAS's attempt to sell the mark in 2012 thus cannot rebut To-Ricos's prima facie case of abandonment absent evidence that PAS carried that intent into the statutory period.

To that end, PAS argues that the comment made by its president during the 2012 negotiations provides forward-looking evidence of the company's intent to resume use of the mark. Of course, courts may consider evidence "regarding [a mark owner's] practices that occurred before or after the three-year statutory period to infer [an owner's] intent to resume use during the three-year period." Crash Dummy Movie, LLC v. Mattel, Inc., 601 F.3d 1387, 1392 (Fed. Cir. 2010). However, the relevant comment only indicates that PAS held a vague intention, as of 2012, to

_____

[23] While it is undisputed that PAS did not use the mark from 2011 to 2016, To-Ricos identifies April 2013 to April 2016 as the relevant three-year period of nonuse. PAS does not challenge this framing by To-Ricos, so we similarly treat April 2013 to April 2016 as the relevant statutory period for our analysis.

potentially restart chicken production at some unspecified date. That "bare assertion of possible future use is not enough." Silverman, 870 F.2d at 47 (holding that a mark owner failed to rebut the presumption of abandonment). Indeed, "courts have generally held that a trademark owner cannot rebut a presumption of abandonment merely by asserting a subjective intent to resume use of the mark at some later date." ITC, 482 F.3d at 150; see also Emergency One, 228 F.3d at 537 ("[T]he owner of a trademark cannot defeat an abandonment claim . . . by simply asserting a vague, subjective intent to resume use of a mark at some unspecified future date.").

Thus, neither PAS's attempt to sell the mark in 2012, nor the comment PAS's president made during that negotiation, support the requisite intent, within the statutory period, to resume use of the mark in the reasonably foreseeable future.

### 2. Unencumbering the Mark (2014)

PAS next argues that it manifested its intent to resume use of the Picú mark by settling its litigation with the Bank in 2014. Recall that PAS, as part of the initial loan agreement, had granted the Bank a lien over its assets, including the Picú mark. When PAS allegedly breached the loan agreement, the Bank sued to collect on outstanding payments and exercise its right to foreclose on PAS's assets. Under the 2014 settlement agreement between the two parties, the Bank had a right to foreclose on most of PAS's

- 23 -

assets, but not the Picú mark.  The agreement provided that once the Bank foreclosed on PAS's other assets, the lien on the Picú mark would be discharged.  PAS argues that its exclusion of the Picú mark from the list of foreclosable assets in the settlement agreement reflected its intent to resume use of the mark.

However, PAS cannot rely on evidence of its settlement agreement to help satisfy its burden of production.  That is because PAS's effort to own an unencumbered <u>right</u> to the Picú mark does not imply its intent to resume <u>use</u> of the mark in commerce in the reasonably foreseeable future.  <u>See</u> 15 U.S.C. § 1127 ("'[U]se in commerce' means the bona fide use of a mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.").  The Bank's lien never precluded PAS from using the mark; it only gave the Bank the right to apply PAS's profits to PAS's unsatisfied debts.  By attempting to remove the Bank's lien, PAS simply sought to regain the unencumbered right to <u>profit</u> from the mark, not its ability to <u>use</u> the mark.  <u>See</u> <u>AmBrit, Inc.</u> v. <u>Kraft, Inc.</u>, 812 F.2d 1531, 1550 (11th Cir. 1986) ("Trademark rights flow from use, not from intent to protect rights.").

More importantly, the record contains no evidence indicating that PAS in fact intended to resume use of the mark before or after it became free of the Bank's encumbrance.  <u>See</u> <u>Vais Arms, Inc.</u> v. <u>Vais</u>, 383 F.3d 287, 294 (5th Cir. 2004) (burden of production not satisfied by evidence of a mark owner's

"subjective, uncommunicated desire not to abandon the mark, without any indication of when or how he intended to resume its commercial use"). PAS could have licensed the then-encumbered mark to another entity to maintain the brand's goodwill, yet PAS took no such action during the relevant statutory period -- i.e., between 2013 and 2016. Moreover, under the settlement agreement, PAS agreed to allow the Bank to foreclose on "almost everything" owned by the company, including its machinery and facilities, so it is unclear how PAS would (or could) resume using the mark in the reasonably foreseeable future once freed from the lien. By protecting its trademark from foreclosure proceedings, PAS may have thought the mark held some value independent of the infrastructure used to make the company's products. Yet "traditional principles of trademark law" provide that "[t]here is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed." Yellowbook, 708 F.3d at 844 (alteration in original) (quoting Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods., 134 F.3d 749, 753 (6th Cir. 1998)).

Even if the settlement agreement reflected PAS's intent to use the mark at some vague point in the future, that would still not be enough. See Qashat, 364 F.3d at 338 (explaining that a "noncommittal, indefinite assertion of intent to resume use [is] insufficient as a matter of law to rebut the presumption of

- 25 -

abandonment").  As noted, to satisfy its burden of production, and thus rebut the presumption of abandonment, PAS must furnish evidence of its intent to resume use in the "reasonably foreseeable future."  Silverman, 870 F.2d at 47 (emphasis added).  The goodwill associated with ephemeral products like chicken is often short-lived, so what constitutes a "reasonably foreseeable future" in this context may be a narrow window.  See Emergency One, 228 F.3d at 537.[24]  Far from expressing an intent to use the mark in the near future, the settlement agreement established that the Bank would retain a lien over the mark until it completed foreclosure proceedings on PAS's other assets.  So, by failing to specify a deadline for the completion of those foreclosure proceedings, PAS deferred its right to an unencumbered Picú mark.[25] At no point did PAS ever express when or how it would use the mark once the lien was discharged.  See Qashat, 364 F.3d at 337-38

---

[24] While there appears to be some evidence that the Picú mark was well-recognized by consumers even after PAS stopped using the mark, PAS does not argue that there was any goodwill still associated with the mark at the end of the statutory period that would impact our analysis of PAS's intent to resume use or abandonment of the mark.

[25] Similarly, PAS cannot maintain that its excuse for not using the mark was due to an "external cause."  See McCarthy, supra, § 17:16.  PAS agreed from the start to secure its financing by granting the Bank a lien over its assets. Moreover, in settling the resulting litigation, PAS failed to bargain for a specific deadline on which the Bank's lien would be discharged.  PAS, not some "external cause," is therefore largely responsible for the mark's prolonged encumbrance, cutting against the company's excuse for nonuse.

(holding that a mark owner could not rebut the presumption of abandonment because it took "no steps" to introduce its product to the market during the statutory period).

Thus, no reasonable jury could therefore view the settlement agreement as probative, alone or combined with other evidence, of PAS's intent to resume use of the mark in the foreseeable future.

### 3. The Licensing Agreement (2017)

Finally, PAS contends that its licensing agreement with IMEX in September 2017 provides evidence of an intent to resume use of the mark. This argument is alluring at first glance. Generally, a mark owner's intent to resume use can be shown by valid efforts to license a mark. See Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 956 (7th Cir. 1992); see also McCarthy, supra, § 17:11 ("An intent to resume use can be evidenced by continuing efforts to license the mark, which can be sufficient to rebut a prima facie case of abandonment.").

That said, there are two problems with PAS's position. First, PAS entered the licensing agreement in September 2017, more than a year after the statutory period of nonuse elapsed in April 2016. "Once a period of nonuse results in abandonment, a resumption of use thereafter cannot cure the preceding abandonment." McCarthy, supra, § 17:3; see also ITC, 482 F.3d at 149 n.9 ("An intent to resume use of the mark formulated after

- 27 -

more than three years of non-use cannot be invoked to dislodge the rights of another party who has commenced use of a mark -- thereby acquiring priority rights in that mark -- after three years of non-use."). To be sure, "evidence arising after the relevant three-year period" could, in some cases, "demonstrate an intent within that period to resume use." ITC, 482 F.3d at 149 n.9.[26] However, no such backward-looking evidence suggests PAS contemplated signing the 2017 licensing agreement within the statutory period. See McCarthy, supra, § 16:9 ("Initial use of the mark, followed by a long period of nonuse, may result in abandonment of whatever rights accrued to the initial usage."). Accordingly, evidence of this agreement does not rebut the statutory presumption of abandonment, and the district court correctly concluded that PAS had abandoned the mark as of 2016. See AmBrit, 812 F.2d at 1550-51. The Picú mark thus returned to the public domain by the time To-Ricos applied to register the mark in April 2016. See ITC, 482 F.3d at 147 (explaining that an

---

[26] For example, consider a scenario in which, one year after the statutory period has elapsed, a mark owner sends the following email to a distributor: "As you know, my product has not been sold for some time. I am excited to announce that, after spending the past five years working to decrease production costs, I am ready to sell my product to the public again." That type of evidence, though arising after the statutory period, is nonetheless probative of the mark owner's intent during the relevant period.

abandoned mark "returns to the public domain and may, in principle, be appropriated for use by other actors in the marketplace").[27]

Second, and more importantly, licensing agreements without adequate quality control cannot show an intent to resume use of the mark. Trademark law does not protect these sorts of arrangements -- referred to as "naked licensing" agreements -- for good reason. See McCarthy, supra, § 18:48 ("Licensing of a mark

---

[27] The district court concluded that "To-Ricos acquired superior legal rights over the mark by filing trademark applications with the USPTO and PRTO in 2016 -- when there were no other live registrations or pending applications containing the term 'Picu' for poultry or related products and services -- and began selling 'Pollo Picu' branded products on or around June 14, 2019." To-Ricos, 2022 WL 19355737, at *3. To the extent the district court implied that To-Ricos established priority rights to the mark as of 2016 by merely applying to register the mark, that conclusion is likely incorrect. Generally, trademark rights vest based on the use of a mark, not mere registration. See Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 815 (1st Cir. 1987); but see ITC, 482 F.3d at 146 n.8 (describing an exception under 15 U.S.C. § 1051(b) not applicable here). However, this error does not change our conclusion. For one, PAS never raised the issue, thus waiving our consideration of it. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). More importantly, it is immaterial whether To-Ricos first established its priority to use the mark in 2016 (when it applied to register the mark) or 2019 (when it started selling Picú-branded chicken). Under either date, To-Ricos would still have priority rights over PAS because PAS never resumed using the mark after it was abandoned in 2016. See Cal. Cedar Prods. Co. v. Pine Mountain Corp., 724 F.2d 827, 828 (9th Cir. 1984) (noting that "the first party to use an abandoned trademark in a commercially meaningful way, after its abandonment, is entitled to exclusive use and ownership of the trademark"); see also, infra, n.28 (noting that PAS's licensing of the mark to IMEX did not confer priority rights to PAS because, under 15 U.S.C. § 1055, the benefit of a licensee's "first use" inures to a licensor only when the licensor "control[s] . . . the nature and quality of the goods" sold by the licensee).

without adequate quality control is known as 'naked licensing.'"). "The purpose of a trademark, after all, is to identify a good or service to the consumer, and identity implies consistency and a correlative duty to make sure that the good or service really is of consistent quality, i.e., really is the same good or service." Gorenstein Enters., Inc. v. Quality Care-USA, Inc., 874 F.2d 431, 435 (7th Cir. 1989). With "[a]ll courts . . . in agreement" that naked licensing may independently result in the abandonment of a trademark, McCarthy, supra, § 18:48, it follows that such agreements cannot show an owner's intent to resume use of a mark. See FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 516 (9th Cir. 2010) ("[N]aked licensing is 'inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor.'" (emphasis omitted) (quoting Barcamerica Int'l USA Tr. v. Tyfield Imps., Inc., 289 F.3d 589, 598 (9th Cir. 2002))); Twentieth Century Fox Film Corp. v. Marvel Enters., Inc., 277 F.3d 253, 259 (2d Cir. 2002) ("Marvel, as the licensor of the 'X-Men' property, is obliged to maintain some control over the quality of the licensed property as an incident of valid licensing or risk abandonment of its mark.").[28]

---

[28] We need not discuss whether the licensing agreement here could independently establish that PAS abandoned the Picú mark. That is because, as we have explained, PAS had already abandoned the mark before it entered the agreement. We refer to the naked licensing doctrine only to explain why the PAS-IMEX agreement is not probative of PAS's intent to resume use of the trademark.

Here, it is undisputed that PAS never inspected the chicken sold by IMEX under the Picú mark. Nor did PAS receive reports of the product's quality from IMEX. To be sure, some provisions in the 2017 licensing agreement aim to regulate the quality of Picú-branded chicken. For instance, PAS retained the contractual right to inspect IMEX's Picú-branded products. However, "[u]nder the modern rule, the question is whether there has been sufficient actual control by the trademark owner-licensor over the nature and quality of the goods or services sold by the licensee." McCarthy, supra, § 18:48. PAS's "contractual right to control" is thus "secondary" to the fact that PAS exercised no actual control over IMEX's products. See id.

Though federal health regulations impose some inspection and quality requirements on IMEX's poultry supplier, see generally 21 U.S.C. § 451, PAS admits that all poultry processing plants in the United States are subject to those regulations. Those generally applicable regulations do not assure consumers that they can expect a specific quality from Picú-branded chicken on a consistent basis. See Gorenstein Enters., 874 F.2d at 435; see also McCarthy, supra, § 18:55 ("The fact that all food service establishments are subject to the regulations of the state Department of Health does not mean that the trademark owner is actually controlling the nature and quality of food products served at a licensed restaurant.").

Finally, PAS notes that the owner of IMEX, Derrick Lugo Colón, is the nephew of Fernando Echegaray, the president of PAS. Though somewhat unclear, PAS seems to argue that, because of this familial connection, PAS was entitled to rely on IMEX's own quality control assurances. Indeed, some courts have looked beyond a licensor's lack of quality control where the licensee was a family member. See, e.g., FreecycleSunnyvale, 626 F.3d at 518 (noting that one such example involved "siblings who were former business partners" for seventeen years). Here, however, no evidence suggests Lugo and Echegaray shared this type of "close working relationship." Id.; Barcamerica, 289 F.3d at 597; see, e.g., Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1117, 1122 (5th Cir. 1991), aff'd, 505 U.S. 763 (1992) (licensor and licensee, who were brothers, enjoyed close working relationship for eight years). PAS, exercising no actual control over the nature and quality of IMEX's Picú-branded products, thus cannot rely on evidence of such a naked licensing agreement to show an intent to resume use of the mark.[29]

---

[29] Though unclear, PAS appears to argue that, even if it abandoned the mark as of 2016, the company's attempt to license the mark in 2017 established a new date of first use of the mark. See McCarthy, supra, § 17:3 ("[A] resumption [of use] represents a new and separate use with a new date of first use."). However, naked licensing agreements cannot confer priority rights to the licensor. See 15 U.S.C. § 1055 (noting that the benefit of licensee's "first use" of a mark inures to a licensor only if the licensor "control[s] . . . the nature and quality of the goods"). Because we conclude that PAS failed to exercise the requisite

The bottom-line is that the 2017 licensing agreement, alone or in concert with other evidence, does not show PAS's intent to resume use of the mark within the relevant statutory period. Accordingly, the district court correctly held that evidence of the IMEX licensing agreement could not satisfy PAS's burden of production to rebut the presumption of abandonment.

*** 

In sum, To-Ricos established a prima facie case of abandonment by showing that PAS had not used the Picú mark for at least three years before April 2016. After To-Ricos established this presumption of abandonment, the burden of production shifted to PAS to rebut the presumption by producing evidence in which a reasonable jury could infer that, between 2013 and 2016, PAS held an intent to resume use of the mark in the reasonably foreseeable future. We agree with the district court's conclusion that PAS failed to carry its burden of production. That is, no reasonable jury could conclude that PAS held the requisite intent to resume use of the mark. The mark was thus abandoned by PAS as of April 2016. To-Ricos established its priority to use the mark, at the latest, by June 2019 when it began selling products under the Picú

---

control over IMEX's Picú-branded goods, the 2017 agreement between PAS and IMEX did not provide PAS with a new "first use" date prior to To-Ricos's use of the mark in 2019.

- 33 -

mark.  We therefore affirm the entry of summary judgment in favor of To-Ricos.

So ordered.